J-A17029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CALEB KENT GRAYSON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ASHLEY REA KISH | : | No. 1484 WDA 2024 |

Appeal from the Order Entered January 13, 2025
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-22-008313-017

BEFORE: McLAUGHLIN, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.: **FILED: September 9, 2025**

Caleb Kent Grayson ("Father") appeals *pro se* from the order which: awarded Ashley Rea Kish ("Mother") primary physical custody and sole legal custody of the parties' three children, J.G. (born in June 2011), C.G. (born in December 2012), and L.G. (born in August 2015) (collectively, "the children"); and awarded Father supervised physical custody of the children once per week. Upon careful review, we affirm.

We glean the relevant factual and procedural history of this matter from the certified record. Father and Mother met in February 2010 but never married, and since 2015 they have resided in the Pittsburgh area with their children. *See* N.T., 7/2/24, at 63, 177. In July 2022, the Allegheny County Office of Children, Youth & Families ("CYF") came to the family home to investigate an anonymous report that Father was physically abusing the children, which report was ultimately determined to be unsubstantiated. *See*

*id*. at 177-80. The parties separated after the incident, and Mother and the children spent approximately five months at a domestic violence shelter. ***See*** *id*. at 11, 180. Thereafter, they relocated to an apartment.

In July 2022, Father initiated the underlying custody action, requesting sole legal and primary physical custody of the children.[1] The following day, Mother filed a protection from abuse ("PFA") petition against Father on behalf of herself and the children.[2] The trial court entered a temporary PFA order awarding Mother primary physical custody of the children subject to periods of partial physical custody with Father at Mother's discretion. ***See*** Temporary PFA Order, 7/22/22. However, in lieu of Mother pursuing a final PFA order, the parties entered into a consent agreement which provided, *inter alia*, that the parties would "cooperate in effectuating custody of the [] children, pending further [court proceedings]." ***See*** Consent Agreement, 8/2/22. Thereafter, Mother responded to Father's custody petition by filing a counterclaim for sole legal and physical custody of the children. Following various custody conciliations, the court entered an interim order on November 1, 2022, awarding Father supervised physical custody every Sunday for up to four hours and one telephone or video call with the children each Friday at 5:00

_____

[1] Father has, at times, been represented by counsel. However, during the underlying custody hearings and in the instant appeal, Father has proceeded *pro se*.

[2] Due to the allegations of abuse against Father, Mother also filed an affidavit of confidential address which was entered by the trial court.

p.m. Between November 2022 and November 2024, the parties exercised custody pursuant to the terms of the interim order.

During this two-year period, Mother and the children began attending trauma therapy related to their experiences while living with Father. *See* N.T., 7/2/24, at 228-29, 234. The children's supervised visitations with Father ended in approximately February 2023. *See* N.T., 3/18/24, at 34-35, 183. The trial court held hearings regarding the parties still-pending custody claims on March 18, 2024, July 1, 2024, and September 27, 2024. At the March 18, 2024 hearing, Father testified on his own behalf; Mother testified and adduced the expert testimony of Patricia Pepe, Ph.D. ("Dr. Pepe"), and the trial court conducted a joint, *in camera* interview of the children, who were then twelve, eleven, and eight years old, respectively.[3]

The testimony and evidence presented at the hearings revealed the following. Dr. Pepe was appointed by the trial court to conduct a full custody evaluation in this case. In pertinent part, Dr. Pepe stated that she typically conducts shared interviews in person; however, the children refused to

_____

[3] Notably, at the at the March 18, 2024 hearing, Father made no objection to Dr. Pepe's qualification by the trial court as an expert witness. However, one month later, on April 18, 2024, Father filed a motion to rescind the court's ruling that Dr. Pepe was qualified to testify as an expert witness. Contemporaneously, Father filed a motion for contempt, proffering, *inter alia*, allegations that Mother was withholding pertinent information regarding the children from Father, that she speaks negatively about Father to the children, and that she is preventing his visitation with the children. Following Mother's responses to these motions, the court denied them.

participate if Father was physically present. *See* N.T., 3/18/24, at 112. Therefore, Dr. Pepe conducted the interview virtually. *See id*. Dr. Pepe testified that the children exhibited negative reactions to seeing Father during the shared virtual interview. *See id*. She further stated that Father blamed Mother for his poor relationship with the children. *See id*. at 108, 113.

Dr. Pepe emphasized that prior to leaving the home, the children did not have a positive relationship with Father, testifying as follows:

> [Mother's Counsel]: [W]hat did you determine [was] the source of [the children's] lack of positive attachment [to Father]?
>
> [Dr. Pepe]: They were very fearful of him. He would yell. He would hit them. They were always in fear of [F]ather hitting them.
>
> They were in fear of not having sufficient food, of his making threats, . . ., to lock up the money so [M]other couldn't buy more.
>
> They described being hungry. They could not leave the house. They were home[-]schooled. They couldn't go [to] activities. They couldn't see friends . . . [and] I think that they really were not permitted to be children in the sense of having a carefree . . . attitude where they could investigate things in their life.

*Id*. at 131-32. Dr. Pepe reported that "food insecurity came up over and over and over again during the evaluation, [and] . . . that was very traumatic for them." *Id*. For instance, Dr. Pepe testified that the children told her they were often hungry when they resided with Father because he told Mother to stop buying food. *See id*. at 124. Dr. Pepe also testified that the children stated that Father would spank them and that, if they cried or talked during a spanking, Father would spank them again. *See id*. at 127. C.G. also told Dr. Pepe that Father would threaten to hit him. *See id*.

- 4 -

While there appeared to be an improvement in the children's relationship with Father at the beginning of 2023, any progress vanished when Father attended J.G.'s basketball game without informing the children beforehand.[4]  *See id*. at 181.  Thereafter, Father stopped scheduling visits and, according to Dr. Pepe, his final visitation request occurred on February 5, 2023.  *See id*. at 183.  Dr. Pepe related to the court that the children are "just being children [now].  They were happy.  They were relaxed.  They said that when they were with [Father] they felt scared.  They were afraid to tell [him] how they felt because he would get . . . mad."  *Id*. at 125.

Based on her evaluation, Dr. Pepe recommended that the trial court award Mother sole legal custody and primary physical custody, subject to Father's supervised physical custody at the discretion of the children.  *See id*. at 135.  She further recommended that the children participate in trauma therapy, that Mother continue therapy, and that Father attend therapy and a batterers intervention program.  *See id*.  Finally, Dr. Pepe stated that she did not recommend reunification counseling at this time because she believed the children need to "work through trauma" and Father needs to "develop a better attitude, where he's going to be more welcoming towards the children."  *Id*. at 136.

---

[4] Mother similarly testified that there was initially some improvement in the children's relationship with Father, but he "sabotaged it" when he attended J.G.'s basketball game.  N.T., 9/27/24, at 55.

Mother testified regarding the conditions that she and the children endured while residing with Father. *See* N.T, 7/2/24, at 187-200. She stated that Father repeatedly threatened to spank the children even for trivial mistakes such as accidentally dropping some food on the floor. *See id*. at 193; *see also* N.T., 9/27/24, at 43 (wherein Mother stated during her cross-examination by Father, "you would threaten them over and over again"). Further, C.G. testified that Father would spank them and "[i]f we cried, he would spank us more." N.T., 3/18/24, at 28; *see also* N.T., 9/27/24, at 44 (wherein Mother stated during her cross-examination by Father, "You were angry if they cried. You told them you were going to do it again"). Mother also testified that Father refused to send the children to in-person school and prevented her from obtaining a job because she was the children's primary caretaker. *See* N.T., 7/2/24, at 189. Mother explained that the children attended school online, which Mother facilitated, starting in first grade. *See id*. at 63; *see also* N.T., 3/18/24, at 10, 111.

Mother further testified that she essentially only left home to go grocery shopping, which was strictly monitored by Father. *See* N.T, 7/2/24, at 190-91. According to Mother, Father provided her a grocery list and was "incredibly angry" if she deviated from the list. *Id*. She also testified that Father has a bad temper. *See id*. at 194-98. She informed the trial court that he once "[drove] the van into a truck . . . while the [children] were inside, in order to teach the truck driver a lesson." *Id*. at 196. Mother also testified

that Father broke a window because he was "angry that the door was locked."

*Id*.

Father categorically denied Mother's testimony. Specifically, he denied perpetrating any abuse on the children and claimed that he had a good relationship with them prior to them leaving. *See id*. at 61-62, 141-42. Further, on cross-examination, Father blamed others for the state of his relationship with the children, testifying as follows:

Q: Do you blame [the CYF caseworker] for breaking up your family?

A: I'm not blaming her for the entirety of breaking up my family. I'm blaming her for not doing her job and contributing to the destruction of my family.

Q: You blame [the visitation supervisor] for the issues of the [children] not coming to visit?

A: Yes, that's right.

Q: You blame Dr. Pepe for the way the children acted in the family interview, right?

A: Yes, that's right.

Q: You blame [Mother] for alienating the children, correct?

A: Yes.

*Id*. at 172-73.

During his *in camera* testimony, the middle child, eleven-year-old C.G., testified that when Father resided with them, he played video games "24/7" or would "sit on the phone . . . and yell at us." N.T., 3/18/24, at 22-23. L.G., the oldest child, then age twelve, confirmed that Father would "ignore us, then

he would go back to the game and then yell at us." *Id*. at 24. The children also testified that they are eating better now that they reside solely with Mother, explaining as follows:

> The Court: [] Do you think you are eating better now than you were before?
>
> [C.G.]: Yes.
>
> [L.G.]: Yes.
>
> The Court: Why do you say that?
>
> [J.G.]: A lot of time we would eat cereal because he wouldn't cook a lot, and . . . now we get to eat. We have [] a pantry full of stuff.
>
> [C.G.]: We would be hungry all the time. []

*Id*. at 50. The children also testified that since they left with Mother in July 2022, they are involved in various activities including soccer, kung fu, drums, violin, cello, piano, and art. *Id*. at 51-52. While with Father, twelve-year-old J.G. stated that they "would just stay in the house." *Id*. at 52. C.G. agreed that when they resided with Father, they "weren't engaged in [activities]." *Id*. at 53. Further, J.G. testified that until the summer of 2022 when Mother enrolled them in in-person schooling, the children attended online school at the behest of Father. *See id*. at 8.

J.G. additionally testified that the children had not been attending visits with Father for over a year. *See id*. at 34-35. L.G. stated that she no longer wanted to attend visits because she did not want to see Father. *See id*. at 37. C.G. testified that he has never attended the visits because he does not

wish to see Father. *See id*. at 37-38. J.G. also stated the following regarding visits with Father: "I dislike the visits. I think it's a waste of time. If we don't want to [or] need to . . ., I feel they shouldn't have to happen, unless we want them to happen, and that's the same thing with the calls."

Regarding phone calls with Father, J.G. stated that she "sometimes" participates. *Id*. at 40. C.G. stated that typically "[w]e just don't [participate]. Everybody just goes away." *Id*. at 40. C.G. further testified that Mother announces to the children when Father is calling and tells them to come over to her if they would like to participate. *See id*. at 41. J.G. and C.G. testified that they would like to live with Mother, and J.G. informed the court that she wants to choose when she has to see or speak to Father. *See id*. at 58-59. Finally, L.G. informed the court that she is afraid of Father. *See id*. at 66.

By order and accompanying memorandum opinion dated November 1, 2024,[5] the trial court awarded Mother sole legal custody and primary physical custody of the children. *See* Order and Opinion, 1/13/25. The trial court awarded Father, *inter alia*, supervised physical custody once per week to occur at Arsenal Family & Children's Center ("Arsenal"). *See id*. The trial court further ordered Father to attend "psychotherapy that is grounded in both

---

[5] Although the custody order and accompanying memorandum were dated November 1, 2024, they were not entered on the docket until January 13, 2025.

anger management and the dynamics of appropriate parental behavior in a custodial setting." *Id*. The court mandated that this therapy occur once per week for at least twelve months and ordered Father to comply with all resulting recommendations.

In addition, the trial court ordered Mother and the children to continue engaging in trauma therapy and ordered Father to pay for the costs of the children's therapy, but not Mother's sessions. Finally, the trial court ordered reunification counseling for Father and the children, as follows:

> After a period of six (6) months from the date of this order, and upon successful completion of regular custodial visits by Father at Arsenal, Father and the children shall commence reunification counseling with a counselor to be agreed upon by the parties. If the parties are unable to agree, then Father shall choose the counselor. Father shall assume all costs of the reunification counseling. Mother shall cooperate in ensuring that the children are available for all reunification counseling sessions, whether in-person or by video conference. Reunification counseling shall take priority over any scheduled activities of either Mother or [the] children. The parties shall follow all recommendations of the reunification counselor, including any recommendations by the counselor that would expand Father's custodial periods.

Order, 1/13/25.

On November 26, 2024, Father timely filed a *pro se* notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[6] The trial court thereafter submitted a

_____

[6] At the time Father filed his notice of appeal, the trial court had not yet entered the custody order on the docket. Accordingly, this Court sought
*(Footnote Continued Next Page)*

statement pursuant to Rule 1925(a)(2)(ii), referring this Court to the reasoning set forth in the memorandum opinion accompanying its custody order.

Father raises the following issues for our review:

1. Did the trial court fail to apply the updated 2024 custody statute and 16 custody factors under 23 Pa.C.S.A. § 5328(a), thereby misapplying law to the detriment of [Father]?

2. Did the trial court impose supervised visitation and remove legal custody without a finding of unfitness, violating [Father's] constitutional and statutory rights?

3. Did the trial court improperly apply a "rebuttable presumption" against [Father] that was not applied to [Mother], undermining due process and equal protection?

4. Did the trial court improperly admit Exhibit O1-O3 despite lack of authentication, metadata, or contemporaneous documentation?

5. Did the trial court exclude a relevant phone call recording, despite its admissibility under the vicarious consent doctrine?

6. Did the trial court err by qualifying Dr. . . . Pepe as an expert despite evidence she failed Rule 702 standards and had prior sanctions?

7. Did the trial court rely on unsubstantiated allegations of abuse lacking dates, witnesses, or CPS findings?

8-23. To be listed in alignment with full argument structure below.

_____

clarification regarding the origins of Father's appeal. Ultimately, as explained above, the trial court entered the underlying custody order on the docket on January 13, 2025. Thereafter, this Court directed Father to file an amended notice of appeal, and Father timely complied with that directive.

24. Did the trial court err in assigning 100% of reunification therapy and visitation costs to [Father] without financial inquiry, causing an undue burden?

Father's Brief at unnumbered 7-8 (cleaned up).[7]

Our standard and scope of review in this area of the law is well-established:

> Our standard of review over a custody order is for a gross abuse of discretion. Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record.
>
> In reviewing a custody order, we must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the trial court who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Rogowski v. Kirven*, 291 A.3d 50, 60-61 (Pa. Super. 2023) (cleaned up) (citations omitted). "It is not this Court's function to determine whether the

_____

[7] Father's issues numbered "8-23" relate to his contentions that the court erred in analyzing each of the sixteen custody factors to be considered by the trial court pursuant to section 5328(a). *See* Father's Brief at unnumbered 25-47. Further, in the argument section of his brief, Father's twenty-fourth issue relates to the final custody factor, section 5328(a)(16). Father also includes a twenty-fifth and twenty-sixth issue at the conclusion of his argument section. *See id*. at unnumbered 47-50.

trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion[.]" ***King v. King***, 889 A.2d 630, 632 (Pa. Super. 2005) (quoting ***Hanson v. Hanson***, 878 A.2d 127, 129 (Pa. Super. 2005)).

As with all custody-related matters, the paramount concern is the best interest of the child involved. ***See Rogowski***, 291 A.3d at 61. To that end, a trial court is only empowered to change an existing custody order if the modification will "serve the best interest of the child." 23 Pa.C.S.A. § 5328(a). Section 5338(a) sets forth sixteen factors that a court must consider prior to modifying an existing custody order. ***See E.B. v. D.B.***, 209 A.3d 451, 460 (Pa. Super. 2019).

We begin our review by addressing Father's first issue, which relates to the version of section 5328(a) that should apply in these proceedings. In this regard, we note that section 5328(a) was amended by the General Assembly in April 2024, and the amended version of the statute took effect on August 13, 2024. ***See Velasquez v. Miranda***, 321 A.3d 876, 886 n.6 (Pa. 2024).[8]

---

[8] Our General Assembly further amended section 5328(a) on June 30, 2025, with an effective date of August 29, 2025. ***See*** 2025 Pa. Legis. Serv. Act 2025-11 (H.B. 378). However, because the subject proceeding concluded before the effective date of the 2025 amendments, those amendments do not apply in this case. ***See R.M. v. J.S.***, 20 A.3d 496, 513 n.15 (Pa. Super. 2011) (declining to apply revised version of statute in custody proceedings that concluded several months prior to the revisions taking legal effect).

Father asserts the trial court failed to consider the amended version of section 5328(a) in fashioning the subject custody order, which was entered after the effective date of the amendment. Father's Brief at unnumbered 12-13. Father contends the trial court applied the pre-amendment version of the statute, and that the court's application of the pre-amendment factors was erroneous and prejudiced his claims, since the amended factors "place a stronger emphasis on emotional abuse, psychological safety, and efforts to alienate a child from the other parent – factors directly relevant to this case." Father's Brief at unnumbered 12.

Contrary to Father's arguments, our review discloses that the trial court applied the amended version of section 5328(a) when arriving at its custody ruling in this matter. *See* Trial Court Opinion, 1/13/25, at unnumbered 2-6 (setting forth the sixteen factors to be addressed by the trial court, as amended by the General Assembly in 2024). As explained above, the amendments to section 5328(a) took effect on August 13, 2024. The trial court authored its custody order on November 1, 2024, and the order reflects that the court considered the sixteen custody factors set forth in the amended version of section 5328(a). *See id*. Thus, we find no merit with respect to Father's first issue.

For the sake of expediency, we will review Father's claims pertaining to the trial court's findings pursuant to the section 5328(a) factors, which he has

addressed in his eighth through twenty-fourth issues. These factors, as amended effective August 13, 2024, provide, as follows:

### § 5328. Factors to consider when awarding custody

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1), and (2.2) which affect the safety of the child, including the following:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts protect the child shall not be

considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be cause by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In order to evidence its consideration of these required elements, the trial court must set forth a discussion of these best-interest factors "prior to the deadline by which a litigant must file a notice of appeal." *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014). This Court has emphasized that the trial court, as the finder of fact, determines "which factors are most salient and critical in each particular case." *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (citing *A.D. v. M.A.B.*, 989 A.2d 32, 35-36 (Pa. Super. 2010)).

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." **M.J.M.**, 63 A.3d at 336.

Father challenges each of the trial court's findings pursuant to the sixteen section 5328(a) factors. **See** Father's Brief at unnumbered 25-47. Father generally provides the same arguments that he raises in relation to his other issues. He additionally contends that the trial court awarded custody to Mother based on vague concerns regarding alleged past incidents of alleged physical discipline and despite the absence of any substantiated Child Protective Services findings. According to Father, he was the primary homeschooling and cyber-education facilitator for the children and was also responsible for the majority of meal preparation for them. **See** Father's Brief at unnumbered 28. Father additionally claims that the trial court failed to appropriately account for Mother's attempts to alienate him from the children's lives. **See id**. at 43. Father asserts that, in arriving at its custody decision, the trial court relied on ambiguous, contradicted, and unauthenticated testimony, while ignoring exculpatory testimony.

In its opinion, the trial court set forth a discussion of each of the sixteen custody factors in its memorandum that accompanied its custody order. Therein, it weighed section 5328(a)(1), (2), (2.2), (2.3), (3), (4), (5), (7), (9), (10), (13), and (15) in favor of Mother. **See** Trial Court Opinion, 1/13/25,

at unnumbered 2-5. Conversely, the court found that section 5328(a)(6) and (8) weighed in favor of Father. *See id*. at unnumbered 4. Further, the court determined that section 5328(a)(11) weighed equally in favor of both parties. *See id*. at unnumbered 5. Finally, the trial court found that section 5328(a)(2.1), (12), (14), and (16) were not applicable. *See id*. at unnumbered 2-5.

The trial court specifically reasoned as follows:

**(1) Which party is more likely to ensure the safety of the children.**

The court finds this factor to weight in favor of Mother, in that the children have been consistently in the care of Mother for a significant period of time, with Father having only periods of custody that have been supervised. The court is not convinced that Father would be in a position to provide a more significant safety net for the children. There is no evidence to suggest that Mother has, at any time, compromised the safety of the children.

**(2) Present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.**

This factor weighs in favor of Mother. It is uncontroverted that during their custodial periods with Father, the children were subjected to both physical and emotional abuse. Moreover, in her report and her testimony, Dr. . . . Pep, who conducted the custody evaluations, indicated that the children still suffer emotionally from Father's abusive behavior – so much so that she has recommended trauma based therapy for the children.

**(2.1) The information set forth in § 5329(a) (relating to consideration of child abuse and involvement with protective services).**

This factor does not apply.

**(2.2) Violent or assaultive behavior committed by a party.**

*See* factor No. 2, *supra*.

**(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.**

This factor weighs in favor of Mother. In her evaluation, Dr. Pepe points to Father's desire that he wants ultimate control over when the children may have contact with their Mother. Conversely, it is Mother who has ensured that the children enjoy their custodial times with Father. This is evidenced by the reports of the Happy Child supervisors, who report that Mother encourages the children to engage with Father during is supervised custodial periods.

**(3) The parental duties performed by each party on behalf of the children.**

This factor favors Mother, in that she has been the primary caregiver to the children during the parties' intact relationship, and has continued in that role as the primary custodial parent.

**(4) The need for stability and continuity in the children's education, family life and community life, except if changes are necessary to protect the safety of the children or a party.**

This factor weighs in favor of Mother. Since the parties have separated, with Mother having custodial control, the children have transitioned to in-person schooling rather that the home schooling that was insisted upon by Father. This transition has allowed the children to expand their respective circles of friendships and

relationships though extracurricular activities that were previously prevented by Father.

**(5)    The availability of extended family:**

This factor favors Mother, in that Mother's parents, along with her uncle and her uncles family all reside in the Pittsburgh region.  Father is a native of Nebraska, with his parents residing in Texas.  Father's daughter by a previous relationship resides in Pittsburgh.

**(6)    The children's sibling relationships.**

Other than themselves, the children have no direct sibling relationships.  They have a half-brother and half-sister relationship with Father's other children.  The relationship with the half-brother . . . was sporadic and long distance, as he resides in . . . Nebraska.  Prior to the parties' separation, the half-sister . . . resided with the family.  At the time of trial, [she] expressed her desire to resume her relationship with the [children].

**(7)    The well-reasoned preferences of the child, based upon the child's developmental stage, maturity and judgment.**

The [c]ourt conducted *in camera* interviews of each of the children.  The [c]ourt considered the preferences of the children in reaching its custody determination.

**(8)    The attempts of a party to turn the child against the other parent, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child.  A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party.  A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.**

This is a factor that weighs in favor of Father.  The [c]ourt finds that while the level of conflict between the parties remains pervasive, Mother's fears regarding the safety of the children while in the presence of Father,

particularly the notion that Father intends or has intended to fatally harm herself and the children, are unfounded. Throughout the course of evaluations, and throughout the testimony, Father has steadfastly maintained that Mother is purposefully alienating the children from him. The [c]ourt finds some degree of validity to his claim. Regardless, that validity carries no persuasion in the [c]ourt's final custody order. . . .

**(9)     Which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs.**

*See* factors 3 and 4, ***supra***.

**(10)   Which party is more likely to attend to the daily physical, emotional, developmental, education and special needs of the child.**

*See* factors 3 and 4, ***supra***.

**(11)   The proximity of the residences of the parties.**

This factor is neutral . . . .

**(12)   Each party's availability to care for the child or ability to make appropriate childcare arrangements.**

The resulting custody order renders this factor inapplicable.

**(13)   The level of conflict between the parties, and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

This factor weighs in favor of Mother. As Dr. Pepe points out, Father's continued dysfunctional behavior continues to exacerbate the significant conflict that remains between the parties. This is strongly evidence by the tone and tenor of Father's messages to Mother through the AppClose communication platform.

**(14) The history of drug or alcohol abuse of a party or member of a party's household.**

There is no indication of drug or alcohol abuse by either parent, nor any member of their respective households.

**(15) The mental and physical condition of a party or member of a party's household.**

The testimony and evidence presented clearly manifest significant mental health issues suffered by each party. Mother's participating in outpatient psychotherapy clearly manifests her awareness of these issues. The final court order is designed to ensure that each party either commences or continues with appropriate therapy and counseling.

**(16) Any other relevant factor.**

There are no other relevant [factors that the c]ourt considered in reaching its custody determination.

*Id*. at unnumbered 2-5. We note that while the trial court merely stated that it considered the preferences of the children pursuant to section 5328(a)(7), it is abundantly clear from the record that the children favored remaining with Mother. *See* N.T., 3/8/24, at 58-59, 66.

Upon review, we readily conclude that Father's arguments amount to little more than serial assertions that the trial court should have weighed the evidence of record in his favor, as opposed to Mother's favor. *See* Father's Brief at unnumbered 25-47 (discussing the trial court's alleged errors in failing to properly weigh evidence or credit Father's arguments). On issues of weight and credibility, this Court is bound to defer to the trial court based largely upon its opportunity to assess the witnesses and evidence on a firsthand basis.

- 22 -

*See Rogowski*, 291 A.3d at 60-61. As detailed above, our review of the record indicates that there is substantial evidence supporting the findings of the trial court. Since Father is merely asking us to reweigh the evidence in his favor, he is not entitled to relief on these claims. *See D.K. v. S.P.K.*, 102 A.3d 467, 480 (Pa. Super. 2014). Therefore, we find no merit to Father's eighth through twenty-fourth issues.

Turning to Father's second issue, he argues that pursuant to *Troxel v. Granville*, 530 U.S. 57 (2000), a parent's right to make decisions regarding their children's upbringing must not be undermined without a showing of unfitness. *See* Father's Brief at unnumbered 13. According to Father, "*Troxel* made clear that parents are presumed fit to raise their children unless proven otherwise." *Id*. Father argues that the trial court was required to make a finding that he was "unfit" before it restricted him to supervised physical custody. Father asserts that "the trial court made no finding of unfitness on the record but nonetheless imposed the most severe restrictions on [his] custodial rights, including stripping him of legal custody and relegating him to supervised visitation." *Id*. at unnumbered 14. Father maintains that "this departure from the *Troxel* presumption raises serious constitutional concerns." *Id*. In making this argument, Father concedes that *Troxel* "dealt specifically with the interference of third parties." *Id*.

Father further concedes that "[section] 5328(a) . . . grants courts significant discretion to impose custody restrictions *without requiring proof*

*of parental unfitness*." *Id*. (emphasis added). Nonetheless, Father "submits that the legal presumption of fitness should be incorporated explicitly into the custody framework under [section] 5328(a) to ensure that fitness is established as a threshold requirement before imposing any severe restrictions on a parent's right to custody or contact with their children." *Id*.

Based on our review, we conclude that Father's reliance upon *Troxel* is misplaced. Indeed, Father's own discussion of this case acknowledges that it is inapplicable to the instant controversy since *Troxel* did not involve a custody dispute between biological parents but, rather, addressed a parent's prerogative to limit a child's contact with third parties. *See Troxel*, 530 U.S. 57 (addressing a ruling on paternal grandparents' petition for the right to visit their grandchildren under a Washington state statute providing that "any person" may petition for visitation rights "at any time"). The *Troxel* Court held that the state's visitation statute constituted an unconstitutional infringement on the mother's fundamental right to make decisions concerning the care, custody and control of her two daughters. *See id*. at 60. In reaching its conclusion, the High Court noted that "there is a presumption that fit parents act in the best interests of their children." *Id*. at 68.

Here, we are dealing with custodial rights between biological parents rather than an unconstitutional infringement on parental rights by granting visitation rights to third parties. Moreover, Father specifically concedes that section 5328(a) does not require that the trial court make any finding that a

parent is "unfit" prior to restricting or limiting custodial rights. **See** Father's Brief at unnumbered 14. Thus, in the absence of such a requirement in section 5328(a), which is controlling in this matter, nor any legal authority to support Father's claim, we decline Father's request to superimpose such a requirement into the statute. **See** Pa.R.A.P. 2119(a) (providing that, for each issue raised on appeal, the appellant must provide a discussion and citation of authorities as are deemed pertinent). For these reasons, no relief is due with respect to Father's second issue.

In his third issue, Father argues that the trial court "appeared to operate under a presumption that [Father] was unfit or dangerous, treating allegations against him as presumptively credible while imposing no such burden on [Mother]." Father's Brief at unnumbered 15. Father claims that the trial court's alleged adoption of this presumption "violated [his] right to due process under the Fifth and Fourteenth Amendments" to the United States Constitution, which he asserts "guarantees a presumption of fitness and innocence unless rebutted by substantial, competent evidence." **Id**. According to Father, "[t]he unequal burden of proof applied in this case, especially given [his] consistent engagement and lack of substantiated findings, warrants reversal or remand." **Id**.

Contrary to Father's claims, we observe no indication in the record that the trial court adopted a presumption that he was unfit or dangerous. Father has not directed this Court to any place in the record where the trial court

indicated that it employed any such presumption. *See* Pa.R.A.P. 2119(c) (providing that if reference is made to an opinion, order, or any other matter appearing of record, the brief must set forth a reference to the place in the record where such matter appears). Moreover, to the extent that Father suggests that the trial court should not have credited the testimony of the children and Mother, who specifically testified as to their negative experiences in living with Father, or the expert opinions of Dr. Pepe, Father's arguments implicate the credibility of witnesses and weight of the evidence. As explained above, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial court who viewed and assessed the witnesses first-hand. *See Rogowski*, 291 A.3d at 60-61. For these reasons, Father's third issue merits no relief.

Father's fourth, fifth and sixth issues challenge the trial court's rulings on the admission or exclusion of evidence. As this Court has explained, "[t]he admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion." *Wilson v. Smyers*, 284 A.3d 509, 514 (Pa. Super. 2022). In this context, "[a]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Id*. (quotation marks and citation omitted).

- 26 -

In his fourth issue, Father claims that the trial court admitted photographs proffered by Mother without sufficient authentication. With respect to authentication, our Supreme Court has explained that "[a] photograph must be verified either by the testimony of the person who took it or by another person with sufficient knowledge to state that it fairly and accurately represents the object or place reproduced[.]" *Nyce v. Muffley*, 119 A.2d 530, 532 (Pa. 1956); *see also* Pa.R.E. 901(a) (providing that "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is").

The photographs in question documented a black eye that C.G. developed after Father "slapped him across the face." N.T., 7/2/24, at 193-94. When offering these photographs as evidence, Mother averred that she had taken the photographs, the photographs presented a fair and accurate depiction of the black eye that C.G. developed after the slap, and she indicated that she thought the incident occurred in January 2016, shortly after his birthday. *See id*. Mother also testified that she was present in the home when Father hit C.G. and she "heard the slap" from upstairs. *Id*. at 195. During cross-examination by Father regarding these photographs, Mother indicated that she was unsure whether the slap occurred in January of 2016 or January of 2017, but consistently testified that she took the pictures of

C.G.'s face on the day after Father slapped him. *See* N.T., 9/27/24, at 18-20.

Father claims that the trial court improperly admitted the photographs into evidence because they lacked any timestamp, location metadata, or authentication of when or where they were taken. Father further claims that the trial court should have excluded these photographs since Mother could not remember the exact year that the photographs were taken. According to Father, this inconsistency alone undermines the evidentiary reliability and highlights the speculative nature of the accusation. Father also points out that Mother admitted that she did not witness the slap and was upstairs when it occurred in the basement.

Based on our review, we discern no abuse of discretion by the trial court in admitting the photographs. Contrary to Father's arguments, there were no inconsistencies regarding the provenance of the photographs in Mother's testimony. Mother testified that she, herself, had taken the photographs in question and explained they were taken on the day after Father slapped C.G. *See* N.T., 7/2/24, at 193-95; N.T., 9/27/24, at 18. Mother further testified that the photographs fairly and accurately depicted the black eye that C.G. developed after the slap. *See* N.T., 7/2/24, at 193-94. That the photographs did not bear a timestamp or location metadata, or that Mother could not recall if the slap occurred in January of 2016 or January of 2017, does not diminish the authenticity of the photographs such that their admission by the trial court

was manifestly unreasonable. Thus, as we discern no abuse of discretion by the trial court in reaching its determination that Mother sufficiently authenticated the challenged photographs, Father's fourth issue merits no relief.

In his fifth issue, Father challenges the trial court's decision to sustain Mother's objection to the admission of a recording that Father wished to introduce into evidence. Father sought to admit a recording that he made of a telephone conversation between himself and L.G. in 2022. **See** Father's Brief at unnumbered 18-20. Father contends that the recording demonstrated signs of parental alienation, the children's desire to reconnect, a lack of autonomy, and potentially coercive influence by Mother. Father explains that he referenced this call in his cross-examination of Mother, but the trial court sustained Mother's objections to the recording. Father claims that, by excluding this probative evidence, the trial court deprived the record of direct statements from the child demonstrating both affection for Father and insight into Mother's controlling behavior. Father indicates that the admissibility of the recording was discussed at a pretrial conference and the trial court did not indicate on the record its basis for excluding the recording. However, Father indicates that the court appeared to accept opposing counsel's position that the recording was inadmissible under the Wiretap Act, 18 Pa.C.S. §§ 5703-5728 (which, *inter alia*, prohibits a person from intercepting "any wire,

electronic or oral communication," except as provided elsewhere in the Act).[9] Father claims that the recording was relevant to certain custody factors, and its exclusion denied him his due process right to present relevant evidence.

Here, the record reflects that the phone call in question purportedly took place three weeks after the temporary PFA order was issued in 2022, when L.G. was six or seven years old. *See* N.T., 9/27/24, at 62-63. Mother's counsel objected to the recording on the basis that there were potential wiretap violations, and the recording consisted of inadmissible hearsay statements. *See* N.T., 7/2/24, at 74-75. Mother's counsel further indicated that the children would testify in person before the trial court. *See id*. In response to counsel's argument, Father offered no counterargument. *See id*. Indeed, Father made no attempt to argue that the Wiretap Act did not apply to the recording, or that the recording fell within any exception to the rule against the admission of hearsay at trial. *See id*. While it is true that the trial court did not state the basis for its decision to exclude the recording, Father notably did not ask for one. *See id*.

_____

[9] Father additionally relies on a purported criminal case, which he cites as ***Commonwealth v. Clark***, 209 A.3d 1009, 1016 (Pa. Super. 2019), for the proposition that the case established the "vicarious consent doctrine," which Father claims permits a parent with legal custody to consent on behalf of a minor child when recording a conversation, if done in good faith and for the child's welfare. **See** Father's Brief at 19. Initially, we note that our research discloses no such case at that citation. In any event, Father did not raise this "vicarious consent doctrine" argument before the trial court. Thus, the argument is waived. **See** Pa.R.A.P. 302(a) (providing that issues not raised in the trial court are waived and cannot be raised for the first time on appeal).

However, even assuming that the trial court excluded the recording on the basis of potential wiretap and hearsay violations, Father's failure to raise any argument before the trial court that the admission of the recording would not pose any potential wiretap or hearsay violations deprived the court of any opportunity to promptly correct any perceived error. *See Dilliplaine v. Lehigh Valley Tr. Co.*, 322 A.2d 114, 116-17 (Pa. 1974) (explaining that the opportunity to correct alleged errors at trial advances the orderly and efficient use of our judicial resources because, *inter alia*, appellate courts will not be required to expend time and energy reviewing points on which no trial ruling has been made). Moreover, Father's failure to provide arguments before the trial court as to why the recording should not be excluded from evidence precludes him from raising any new arguments for the first time on appeal. *See* Pa.R.A.P. 302(a).[10] Thus, as we discern no abuse of discretion by the trial court in excluding the recording, Father's fifth issue merits no relief

In Father's sixth issue, he contends that the trial court improperly permitted Dr. Pepe to testify as an expert witness. Initially, we must

_____

[10] In any event, assuming, *arguendo*, that the trial court erroneously excluded this recording, we deem any such error to be harmless. Instantly, Father had the opportunity to fully cross-examine Mother regarding the content of the recorded phone call. *See* N.T., 9/27/24, at 62-63. Accordingly, Father successfully elicited testimony describing the hearsay statements made by L.G. during the call and, consequently, the recording itself would have been merely cumulative. *See Soda v. Baird*, 600 A.2d 1274, 1277 (Pa. Super. 1991) (holding that the exclusion of evidence is not grounds for the granting of a new trial if evidence of the same facts were introduced by the party applying for a new trial).

determine whether Father preserved this issue for our review. It is axiomatic that a timely, specific objection must be raised to preserve allegations of trial court error. **See Stapas v. Giant Eagle, Inc.**, 197 A.3d 244, 248 (Pa. 2018); **see also Criswell v. King**, 834 A.2d 505, 508-09 (Pa. 2003) (holding that litigants must preserve issues for appeal by making contemporaneous objections at trial). Indeed, requiring a timely, specific objection at trial promotes judicial efficiency by giving the trial court the opportunity to correct trial errors, reducing appellate review of those issues, and avoiding the delay to litigants inherent in appellate review. **See Stapas.**, 197 A.3d at 248. The failure to make an objection at the earliest opportunity can result in waiver. **See State Farm Mut. Auto. Ins. Co. v. Dill**, 108 A.3d 882, 885 (Pa. Super. 2015) (*en banc*)*.*

Here, at the March 18, 2024 hearing, Father raised no objection to Dr. Pepe's qualifications or to her being permitted to testify as an expert witness in the proceedings. Indeed, when the trial court asked Father if he had any such objections, Father indicated that he had no objections to her qualifications as an expert:

> [Mother's Counsel]: At this time, I would like to move for Dr. Patricia Pepe to be admitted as an expert.
>
> The Court: Do you have any objection, [Father]?
>
> [Father]: No.
>
> The Court: All right. She will be able to testify as an expert and offer opinions.

N.T., 3/18/24, at 102. Approximately one month later, Father filed a motion in which he belatedly objected to the trial court's qualification of Dr. Pepe as an expert witness. ***See*** Motion, 4/18/24.

Based upon the foregoing, we conclude that Father has waived this argument by failing to lodge a timely and specific objection to the trial court's qualification of Dr. Pepe as an expert witness. Father's failure to raise any objection at the March 18, 2024 hearing deprived the trial court of the opportunity to correct any perceived error at the time it's qualification ruling was made. ***See Stapas.***, 197 A.3d at 248. Father's belated attempt to challenge this ruling one month after Dr. Pepe had been qualified as an expert witness and provided her opinion testimony was insufficient to preserve this claim for review on appeal. ***See id***.; ***see also Dill***, 108 A.3d 885. Thus, we deem his sixth issue waived.[11]

In Father's seventh issue, he contends that the trial court erred when it denied him an opportunity to present rebuttal testimony. ***See*** Father's Brief at unnumbered 16-18; ***see also*** N.T., 9/27/24, at 104-05. We note that "[g]enerally the admission of rebuttal evidence is a matter within the sound

_____

[11] Father claims that he objected to Dr. Pepe's testimony at a pretrial conference, but the trial court deferred its ruling on his objections and indicated that it would make a determination after hearing her testimony at trial. However, this purported pretrial objection, which is not reflected in the certified record, did not preserve the issue on appeal, since Father explicitly stated at the March 18, 2024 hearing that he had no objection to Dr. Pepe's qualification as an expert witness. ***See*** N.T., 3/18/24, at 102.

discretion of the trial court. Rebuttal evidence is proper where it is offered to discredit testimony of an opponent's witness." ***American Future Systems, Inc. v. BBB***, 872 A.2d 1202, 1213 (Pa. Super. 2005).

Father has, again, significantly misrepresented the events in the trial court. At the conclusion of Father's case at the September 27, 2024 hearing, the following exchange took place between Father and the trial court:

The Court: So you have no other witnesses?

[Father]:     I have no other witnesses.

The Court: Any rebuttal?

[Father]:     Like a closing, is that what you mean by rebuttal?

The Court: No.      Rebuttal would be a rebuttal witness, if something was brought up that you want to –

[Father]:     To bring back a witness?

The Court: Yeah, or if there was some other rebut of something that was said.

[Father]:     Oh, I see.  No rebuttal.

N.T., 9/27/24, at 104-05.

To the extent that Father contends that the trial court somehow denied him the opportunity to present rebuttal testimony, his claim is fully belied by the above-quoted portion of the certified transcript. ***See id***. Thus, based upon the foregoing, we conclude that the trial court did not deny Father an opportunity to present rebuttal evidence. Instead, Father chose not to present

any rebuttal testimony. Accordingly, no relief is due with respect to Father's seventh issue.

Having previously disposed of Father's numerous arguments at issues eight through twenty-four, we now turn to his twenty-fifth issue, wherein he contends that the trial court erred in directing Father to bear various financial costs related to his supervised physical custody of the children, including reunification therapy and "related services." Father's Brief at unnumbered 47-48. Father claims that this ruling was made without any inquiry into the parties' financial status or income. Father claims that the court's ruling violated the cost allocation principles articulated in *M.P. v. M.P.*, 54 A.3d 950, 955 (Pa. Super. 2012).

Initially, we note that *M.P.* is inapposite. That case involved a trial court's ruling that mother, who had sole legal custody of her daughter, could not take her daughter to Ecuador to visit the child's maternal grandparents. This Court concluded that the trial court abused its discretion and erred as a matter of law when it precluded such travel, relied on information from outside the record after the hearing was concluded, and failed to provide its reasoning to the parties until after mother filed her appeal. Importantly, *M.P.* included no discussion of, or reference to, any purported cost allocation principles.

Father has otherwise provided no pertinent legal authority to support his argument related to this issue. *See* Pa.R.A.P. 2119(a) (providing that, for each issue raised on appeal, the appellant must provide a discussion and

citation of authorities as are deemed pertinent).  In the absence of any such discussion of pertinent legal authority, we determine that Father has waived his claim for lack of development.  **See C.H.L. v. W.D.L.**, 214 A.3d 1272, 1276 (Pa. Super. 2019) (stating "that the failure to develop an argument with citation to, and analysis of, pertinent authority results in waiver of that issue on appeal").

In his twenty-sixth and final issue, Father has attempted to raise a number of additional issues that were not included in his Rule 1925(a)(2)(i) concise statement.  Generally, issues not included in a concise statement are waived and cannot be raised for the first time on appeal.  **See** Pa.R.A.P. 1925(b)(4)(vii); **see also Milicic v. Basketball Marketing Co., Inc.**, 857 A.2d 689, 693 (Pa. Super. 2004) (holding that issues not properly included in an appellant's concise statement of matters complained of on appeal pursuant to Rule 1925(b) are deemed waived).  Accordingly, as Father failed to raise these issues in his concise statement, they are waived.

Based upon the foregoing, we conclude that the trial court did not abuse its discretion or err as a matter of law in fashioning the January 13, 2025 custody order.[12]  Accordingly, we affirm the order.

---

[12] In arriving at this conclusion, we are mindful that Father is proceeding *pro se* in this matter.  Nonetheless, while this Court is willing to liberally construe materials filed by a *pro se* litigant, we note that Father is not entitled to any particular advantage because he lacks legal training.  **See, e.g., O'Neill v. Checker Motors Corp.**, 567 A.2d 680, 682 (Pa. Super. 1989).  Instead, "any
*(Footnote Continued Next Page)*

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

9/9/2025

---

layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing." **Vann v. Commonwealth**, 494 A.2d 1081, 1086 (Pa. 1985).